Keeler *v.* Keeler.

HARRIET A. KEELER

*v*

EZRA W. KEELER and others.

1. Cotton machinery, such as Danforth spinning-frames, twisting-frames &c., though fastened to the floor by nails or screws, or held in position by cleats,—*Held*, to be personal property, and to pass under a chattel mortgage thereof, as against a mortgage of the realty subsequently given, describing the property as "all those certain mills, factories &c., and all the machinery and fixtures in the same."

2. Personal property included in the chattel mortgage, but incorporated with the realty,—*Held*, not to pass by the chattel mortgage as against the subsequent mortgage of the realty. The property was a steam-engine, securely and permanently bolted to a foundation set in the ground, with the boilers as a necessary adjunct thereto, together with the shafting, belting, couplings and pulleys to communicate the power; also, water-wheels and a water-wheel governor.. A gas-generator, situated in a pit in a building constructed for it on the premises, the gas-pump connected with it, and the pipes, were also included. Also, gas-burners, as not being furniture but mere accessories to the mill. Also, steam-heating-pipes laid on hooks attached to boards fastened to the walls, and heating-pipes, part of the system of piping, which merely rested upon the floor, without being attached to it.

3. The fact that property personal in its nature, but not incorporated with the realty, has, in transmission, been passed merely by the deed for the land, does not establish its character. Its character is not affected by long-continued localization alone.

Bill to foreclose chattel mortgage. On final hearing on pleadings and proofs.

Keeler *v.* Keeler.

*Mr. F. Kingman,* for complainant.

*Mr. W. D. Holt* and *Mr. B. Gummere,* for defendants, James S. Woodward's Sons.

THE CHANCELLOR.

The bill states that, on or about the 1st of February, 1869, the defendant, Ezra W. Keeler, was indebted to Heman Keeler, of Rome, New York, in the sum of $20,000, and, to secure the payment thereof in five years, with interest, payable semi-annually, he, by his mortgage of that date, mortgaged to the latter the goods and chattels mentioned in a schedule annexed to the instrument, and then being in the Clarence Cotton Mills, at Groveville, in Mercer county, in this state. The schedule specifies Danforth frames, power reels, twisters, ballers, a banding-machine, belting, line and counter shafting, drums, hangers and pulleys, spoolers, willows, presses, scales, old machinery, cards, Danforth railroad-heads, speeders, drawing-frames, grinding-frames, looms, beaming-frames, lathes, cans, tools, warping-mills, mules, mule-reels, hand-reels, steam-pipes, bobbins, pickers, railway-head gear, force-pump for fire and attachments, engine-pumps, boilers, and a grindstone and an office stove. The mortgage was filed in the clerk's office of Mercer county, on the 13th of February, 1869, and a copy, with a statement exhibiting the interest of the mortgagee in the property, was again duly filed in that office (the mortgagor resided in Mercer county, and the mortgaged property was there) in each of the five years immediately following.

It further appears, by the bill, that, for further security for the debt and interest, the mortgagor, on or about the 1st of January, 1875, gave to Heman Keeler his promissory note, of that date, payable one day after date, to the order of the latter, and that the note was afterwards, for a valuable consideration, assigned and endorsed by Heman Keeler to Caroline S. Bemis, and that Ezra W. Keeler, after the

assignment, gave to her, to secure the payment of the note, and (as declared in the mortgage) by way of renewal, a mortgage, dated January 1st, 1876, upon the machinery in the mill, including engine and boilers, shafting, pulleys, gas-machine, office furniture, &c. The schedule mentions all the articles specified in the schedule to the Heman Keeler mortgage, with the addition of counters, warping-mills, a cutter, slubber-frames, spools, the engine, a gas-machine, works and attachments, gas-traps and gas-pipes, and some office furniture.

The bill states that that mortgage was duly filed in the clerk's office of Mercer county, on the 20th of January, 1876, and that afterwards Caroline Bemis, for a valuable consideration, assigned and endorsed the note to the complainant; that, subsequently, Ezra W. Keeler, in order to secure the payment of the note to the complainant, and, as declared in the mortgage, as "a renewal to secure a former indebtedness to Heman Keeler," gave her a mortgage, dated January 13th, 1877, upon the machinery, tools and office furniture in the mills, by the same description contained in the schedule to the Bemis mortgage; that the mortgage to the complainant was filed in the clerk's office, January 19th, 1877; that, in December, 1876, Ezra W. Keeler gave the complainant his three promissory notes, each for $700, and payable respectively at six, twelve and eighteen months after date (December 22d, 1876), for interest on the note of $20,000, and, to secure the payment thereof, gave her a mortgage upon "all the machinery and fixtures, of every nature and kind whatsoever, belonging to the cotton mills of his estate at Groveville, New Jersey"; that that description included certain goods and chattels not covered by the Bemis mortgage, viz., some cards, shoddy-machines, a cotton-lapper, a cotton-willow, some tables, a grinder, some presses, and a lot of tools in the bat-mills, also shafting, belting, pulleys &c.; and that that mortgage was filed on the 13th of January, 1877.

The bill further states that, on or about the 19th of October, 1877, the persons composing the firm of James S. Woodward's Sons, recovered a judgment against the mortgagor, in the supreme court of this state, and on the same day Caleb J. Milne also recovered a judgment (now held, as appears by the answer, by James S. Woodward's Sons) against him in that court, on which judgments executions were issued and delivered to the sheriff; by reason whereof the mortgage to secure the payment of the three notes of $700 each, became, by its terms, due. It provided that, if the mortgagor permitted judgment to be entered against him, the money should instantly be due.

The bill further states that, on or about the 7th of June, 1870, Ezra W. Keeler executed a mortgage to the persons composing the firm of James S. Woodward's Sons, upon his mills and factories, and the machinery and fixtures therein, to secure the payment of $10,000.

The complainant insists that her mortgages are the first encumbrances on all the property therein mentioned.

The defendants, James S. Woodward's Sons, have answered. They, by their answer, attack the complainant's mortgages as fraudulent, and insist that they were intended as a cover for, and protection to, the property which they purport to mortgage, from the creditors of Ezra W. Keeler, and that there was, in fact, no indebtedness from the mortgagor to the mortgagees, or any of them, but that the notes and mortgages were all alike, mere fraudulent contrivances to deceive; and, further, that if there ever was any indebtedness for which they were given, it has been paid. They further insist that, when their mortgage was given, it was agreed that they should have a mortgage, not only upon the lands and real estate of the mortgagor, but that the mortgage should be a lien, also, on all the fixtures and machinery, of whatever kind, then in the mills, or which might subsequently be placed therein, whether held to be fixtures or not; and that Caroline S. Bemis had notice of the agreement when she took her chattel mortgage, and had

notice, also, by the language of their mortgage, which was on record, that the mortgagor intended to mortgage thereby, not only the land and buildings, but also all the machinery and fixtures in the mills.

The proof establishes the debts which the complainants' mortgages were given to secure, and there is no evidence of bad faith on the part of the complainant or Caroline S. Bemis or Heman Keeler.

The mortgage to Heman Keeler was on file when the Woodward mortgage was taken. The firm of James S. Woodward's Sons, therefore, had constructive notice of it. Their mortgage was given under an agreement, dated June 7th, 1870, between them and Ezra W. Keeler, by which they agreed to accept his time drafts (so, however, that the aggregate amount thereof should not at any time exceed the sum of $10,000), and he agreed to consign all his yarns to them for sale, and not to consign any to any one else while the agreement should continue in force; and he also agreed to secure them against any loss or liability by reason of the acceptances, by his bond and mortgage for $10,000, on "certain properties situate in Mercer and Burlington counties," to be particularly described in the mortgage, and that the mortgage should at all times be a lien on those properties from the date of recording, so that, at all times, the defendants should have a lien thereon for the amount of their liability on the acceptances as of the date of recording the mortgage. The agreement was to remain in force until either party should give the other ninety days' written notice of intention to terminate it, and, on such notice, when and so soon as Ezra W. Keeler should deliver, or cause to be delivered, to the other party all drafts which they might have accepted under the agreement, they were to enter satisfaction of the mortgage. Prior to the making of this agreement, there was a verbal one between the parties to the same effect, and under it James S. Woodward's Sons lent to Ezra W. Keeler their acceptances in March, April and May, 1870, to the amount, in the aggregate, of

$10,000. Very soon after their mortgage was given, they learned of the existence of the mortgage to Heman Keeler. Mr. Hannis, the lawyer who drew their mortgage and who made search of the title for them, says that he ordered the searches when he sent the mortgage to be recorded (it was recorded in Mercer county, June 9th, 1870, and in Burlington county on the 15th of that month), and he says he immediately, on receiving the searches, communicated the fact that the records showed a greater amount of encumbrance than Ezra W. Keeler had represented to Mr. Woodward, and Mr. Woodward says he immediately, on receiving the information from Mr. Hannis, called on Mr. Keeler on the subject, and taxed him with deception, because he had not disclosed, but had concealed, the fact of the existence of the chattel mortgage. Though he says that he thus charged Ezra W. Keeler with fraud, and that his firm afterwards frequently demanded payment of the money secured by their mortgage, yet it appears, by his testimony, that, when the drafts accepted by them in March, April and May, 1870, became due (the last one fell due on the 7th of September, 1870), they had goods of Ezra W. Keeler in their hands, consigned to them under the agreement, sufficient to meet them, and he continued to consign his goods to them, and they to accept his drafts (which were very numerous), under the agreement, up to December 28th, 1875, a period of more than four years.

Mr. Woodward says that the acceptances were mostly at three months, and that, during the period just mentioned, there were always acceptances to the amount of $10,000 outstanding secured by the mortgage. Though, as before mentioned, he says that they frequently demanded their money from Keeler, they never gave him notice to terminate the agreement, and they continued to transact business with him, receiving his yarns on consignment and accepting his drafts, so long as he continued in business for himself (till 1876), and even afterwards, when he carried on the business as agent for another person; and, as appears by

the testimony, they were still doing so when Mr. Woodward testified in this cause.

Again, it appears by Mr. Woodward's testimony that, when he taxed Keeler with deceit, as before mentioned, the latter denied it, and said that when he told the defendants that there was nothing against the property but the first mortgage, he did not refer to the chattels or machinery, and thought it was unnecessary to mention such an encumbrance as the chattel mortgage. And he seems to have entertained this view in good faith. Early in February, 1869, he was advised (by letter dated February 5th), by counsel of this state, to whom he applied for advice on the subject, that all the property which he had mortgaged by the Heman Keeler mortgage was the subject of chattel mortgage. In this connection it may be stated that Mr. Hannis, the lawyer before-mentioned, who drew the Woodward mortgage, says that Ezra W. Keeler and James S. Woodward were present when he received his instructions for drawing that instrument, and that his instructions were to draw a mortgage of $10,000 on the mills, factories, lots of ground, machinery and fixtures in the mills, as described in the mortgage; and he adds that his instructions were embodied in the mortgage.

The mortgaged premises as described in the mortgage are " all those certain mills, factories, houses, lots and parcels of land, and all the machinery and fixtures in the same, commonly called Groveville, situate partly in the township of Hamilton, in the county of Mercer, and partly in the township of Chesterfield, in the county of Burlington, &c.," describing the land alone. It will have been seen that, by the written agreement, only the " properties " were mentioned, and nothing was said about fixtures or machinery, nor any reference made to them. This gives color to Mr. Keeler's statement, that he did not intend to mortgage the machinery and fixtures to James S. Woodward's Sons. The Woodward mortgage was never filed. James S. Woodward's Sons have no equity against the complainant;

but, on the other hand, the latter has an equity against them. If there was bad faith on the part of Ezra W. Keeler towards the firm of James S. Woodward's Sons, in concealing from them the fact of the existence of the Heman Keeler mortgage until after they had given their acceptances, there was none on the part of Heman Keeler. If there was bad faith on the part of Ezra W. Keeler, they ascertained the fact almost immediately after their mortgage was given, and they had the means, through his consignments to them, of protecting themselves; and they also had the means of protection under their mortgage, for it is shown that the real estate, without the machinery, was valuel, in October, 1871, by a professional appraiser, at $156,000, and it was subject to only $20,000 of encumbrance prior to the Woodward mortgage of $10,000.

Ezra W. Keeler testifies that, after he obtained that appraisement, he showed it to James S. Woodward, and referred to the improvements, and told him he had no intention of mortgaging to James S. Woodward's Sons anything but the real property, without the fixtures, and he says Mr. Woodward seemed satisfied. If there was concealment or deceit on the part of Ezra W. Keeler in regard to the existence of the chattel mortgage, that would not affect the validity of the instrument or its lien.

Again, the first acceptance for Mr. Keeler which was protested, fell due in February, 1876. So that, as before remarked, for more than four years after the firm of James S. Woodward's Sons learned of the existence of the chattel mortgage, they continued the arrangement with Ezra W. Keeler, though they might have terminated it on ninety days' notice, and they received consignments of goods from him, under the agreement, to the amount of from $30,000 to $40,000 each year. Mr. Woodward gives as one of his reasons for not putting an end to the arrangement after he learned of the existence of the chattel mortgage, his firm's unwillingness to lose Keeler's business. They knew, for five years before Ezra Keeler's failure in business, that there

was a claim of $20,000 outstanding against him, secured by the Heman Keeler mortgage and its renewals, and they acquiesced in the mortgage. And, further, from time to time during that period, their acceptances were paid off, and new ones were given with full knowledge of the existence of the chattel mortgage. The acceptances which had been given when their mortgage was made, were all paid in 1870. When they gave new ones, it was as if they had taken a new mortgage. They manifestly have no equity against the complainant.

The cause, however, will be disposed of on the legal rights of the parties.

The mortgage to Heman Keeler has never been cancelled. It is entitled to priority as to so much of the property thereby mortgaged as has not changed its character as personalty, but it is not entitled to priority as to so much of it as, from annexation to the freehold, has become part of the realty. *Pierce* v. *George, 108 Mass. 78; Voorhees* v. *McGinniss, 48 N. Y. 278.* It is urged that, not having been refiled after 1875, it became void as against the Woodward mortgage; but the position is untenable. If it had never been refiled after the Woodward mortgage was given, the mortgagees in the latter, having had notice of it, could have had no advantage from the omission to refile. *Meech* v. *Patchin, 14 N. Y. 71.* The statute was, by its terms, designed for the protection of creditors and mortgagees, and purchasers in good faith. The firm of James S. Woodward's Sons, having had notice of the chattel mortgage when they took their mortgage, are not within the protection of the statute. They are not mortgagees in good faith. *Williamson* v. *N. J. Southern R. R. Co., 2 Stew. 311, 336; Coe* v. *N. J. Midland R. R. Co., 4 Stew. 105; Thomas on Mortgages 505.*

As to the property contained in the Bemis mortgage and the mortgages given to the complainant, which was not comprised in the Heman Keeler mortgage, the former are, indeed, new mortgages; but (as far as property personal in

its character, and not so annexed to the freehold as to have become part of the realty, is concerned) they have priority over the Woodward mortgage, which, as before stated, was never filed. The Bemis mortgage, and the mortgages given to the complainant, will be considered, as the parties to them intended that they should be, as additional security for the payment of the Heman Keeler debt.

Part of the property mortgaged by the Heman Keeler mortgage was so annexed to the freehold as to be part of the realty, and, therefore, was not subject to the chattel mortgage as against the Woodward mortgage. The fact that it was included in a chattel mortgage, will not affect its character. *Williamson* v. *N. J. Southern R. R. Co.*, *2 Stew. 311, 328; Voorhees* v. *McGinnis, 48 N. Y. 278; Quinby* v. *Manhattan Cloth Co., 9 C. E. Gr. 260.* The Woodward and Milne judgments were not recovered until October, 1877, long after the last of the complainant's mortgages was filed.

It remains to consider what part of the mortgaged property in question is so annexed to the realty as not to pass under the complainant's mortgages as against the Woodward mortgage. The machinery and apparatus for furnishing motive power, light and warmth to the buildings are in this case part of the realty. The steam-engine is securely and permanently bolted to a foundation set eight or ten feet deep in the ground, and it was put in for permanent use. It, with its appurtenances, is part of the realty, and so are the boilers which are a necessary adjunct to it, also the shafting, belting, couplings and pulleys to communicate the power; and, also, the water-wheels and water-wheel governor. *Crane* v. *Brigham, 3 Stock. 29; Quinby* v. *Manhattan Cloth Co., 9 C. E. Gr. 260; Keve* v. *Paxton, 11 C. E. Gr. 107; Fish* v. *Waterproof Paper Co., 2 Stew. 16; S. C. on appeal, sub nom. McMillan* v. *Fish, Id. 610; Watson* v. *Watson Manufacturing Co., 3 Stew. 483.*

The apparatus for the manufacture of gas (called a generator) is situated in a pit made expressly for it in a small building built for it a short distance from the main building.

It is connected with a gas-pump in the building, and the pipes are attached to the beams and girders by hooks, and, in some places, pass through holes in the side walls, bored for the purpose.  The generator and its appurtenances, and the pipes, are fixtures.  *Hays* v. *Doane, 3 Stock. 84, 96; Ewell on Fixtures 299; Regina* v. *Lee, L. R. (1 Q. B.) 242.* The gas-burners are of the same character in this case. They are in no sense furniture, but are mere accessories to the mill.  *Sewell* v. *Angerstein, 18 L. T. (N. S.) 300.*

Some of the heating-pipes are laid on hooks attached to boards· which are fastened to the walls.  They may be removed without disturbing the· boards or hooks.  In one place there are two nests of piping which rest on the floor without being attached to it.  Such pipes so attached for heating purposes, were, under like circumstances, held to be fixtures, in *Quinby* v. *Manhattan Cloth Co., ubi supra.*  See, also, *Philbrick* v. *Ewing, 97 Mass. 133*, and *Stockwell* v. *Campbell, 39 Conn. 362.*  Those which rest on the floor are not to be excepted under the circumstances.  They are part of the system of piping in the building.

The rest of the property mentioned in the complainant's mortgages, is personal.  The Danforth cap spinning-frames, Danforth cap twisting-frames, the ring and traveler twisting-frames, balling-machines, carding-machines, grinding-machines, drawing-frames, Higgins or jack fly-frames, Higgins slubber, counter twist-speeders, mules, and other machines, though most of them are fastened to the floor by nails or screws, or held in position by cleats, are personal property.  They are annexed merely to keep them in position; some of them could not be operated unless held firmly in place.  Though, in putting down a new floor, it was laid down around the feet and standards of the machines, it was not laid over but only up to them.

What was said in *Blancke* v. *Rogers, 11 C. E. Gr. 563, 568*, is applicable to the machines under consideration : "There appears to have been no special adaptation of these machines to the place where used, nor any preparation of

the place to receive them. They were suitable and proper to be there, if such instruments were required for their appropriate work, but equally suitable and useful elsewhere. They were movable in the building. They were made and designed not for this place or any particular place; they were constructed, after fixed patterns, for all purchasers— things in gross, mere implements, heavy and complicated tools. If they ceased to be used in this factory, they were movable without alteration, without detriment to the building, and could be used equally well in another place provided with power to drive them."

In *Murdock* v. *Gifford, 18 N. Y. 28,* cited in *Blancke* v. *Rogers,* looms in a woolen factory, connected with the motive power by leathern bands (but not otherwise annexed to the building than by screws holding them to the floor, which kept them steady while working), and which could be removed without injury to themselves or the building, were held to be chattels, as between the holder of a mortgage of the factory in which the looms were included, by express description, and a judgment creditor. The mortgage, though recorded, had not been filed. The distinction is there drawn clearly between the wheel or engine which furnishes the motive power, and all that part of the gearing and machinery which has special relation to the building with which it is connected, as belonging to the freehold, and independent machines, such as looms, which, if removed, still retain their identity and usefulness, and do not lose their character as personalty.

In *Teaff* v. *Hewitt, 1 Ohio St. 511,* it was said that the machinery and implements in a manufacturing establishment, although useful, and even essential, for the business carried on, which are not permanently affixed to the ground or structure of the building, and which can be easily removed, without material injury to the building or the articles themselves, and their places supplied by other articles of a similar kind, are not fixtures, but personal property; but that that portion of the property, in such an

establishment, which is firmly affixed to the earth, or to the structure of the building, and which, from its nature, mode of attachment, use and the relative situation of the party placing it there, was plainly intended to be permanent, is parcel of the freehold. See, also, *Walker* v. *Sherman, 20 Wend. 636 ; Swift* v. *Thompson, 9 Conn. 63,* and *McConnell* v. *Blood, 123 Mass. 47.* The decision in the case of *Blancke* v. *Rogers* fixes the character of the property under consideration.

It was urged, on the hearing, that the fact that some of those machines passed to Ezra W. Keeler with the real estate (and he had no other paper title thereto than the deed of the land), and the fact that the machines had been, for many years, used in the same place, in carrying on the operations of the mill, and that there was a long-existing localization of them, were, of themselves, considerations to induce and warrant an adjudication that they had been regarded as, and, in fact, were, part and parcel of the realty. But this subject was considered, and that view rejected, by the court of errors and appeals, in *Williamson* v. *N. J. Southern R. R. Co., 2 Stew. 311, 328.* It was there said that the method of transmuting property personal in its nature into realty, is as fixed and established in the law as the method of testamentary disposition; that personal property does not become realty by mere use in connection with land; that it will not become realty by being included in a mortgage with lands, any more than lands will become personalty by such an association. See, also, *Quinby* v. *Manhattan Cloth Co., 9 C. E. Gr. 260, 267,* and *Murdock* v. *Gifford, 18 N. Y. 28.*

The complainant's mortgages are valid liens, superior to the Woodward mortgage, on all the property mentioned in, and covered by, them, except so much of it as is incorporated with the realty.